UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
COREY FRANKLIN,

                    Petitioner,

      -against-

ROBERT ERCOLE,

                 Respondent.

------------------------------------------------------------X
FEUERSTEIN, J.

**OPINION & ORDER**
**06 CV 00700 (SJF)**

On November 24, 1998, a judgment of conviction was entered against petitioner Corey Franklin ("Petitioner") in the County Court of the State of New York, Suffolk County (Ohlig, J.), upon a jury verdict finding him guilty of murder in the second degree, New York Penal Law § 125.25(1), and imposing sentence. On or about February 9, 2006, Petitioner filed the instant petition ("Petition") *pro se* seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("§2254").

For the reasons stated herein, the Petition is denied and the proceeding is dismissed.

I.     BACKGROUND

    A.    Factual Background[1]

        1.    The People's Case

---

[1] The following facts were taken form the trial transcript ("T.")

a. <u>Eye Witness Testimony</u>

(i) <u>Jason Ward's ("Ward") Testimony</u>

Ward testified that, on November 9, 1997 at about 8:00 p.m., Petitioner told his cousin Ward that he needed a "knife" for "self-defense" because Petitioner "thought somebody was going to hurt him" so Ward gave Petitioner his "brown folding knife," which had a five (5) to six (6) inch long blade. (T. 788-91.)

Approximately one hour later, Jason Edmunds ("Edmunds") was yelling at Tameka Hill ("Hill") in a car outside of Ward's residence.[2] (T. 792-93.) Ward was in front of his residence. (T. 792.) Edmunds asked him if he was "Corey" and Ward responded "no." (Id.) There were approximately six (6) or seven (7) additional people outside at that time. (T. 793.) Petitioner "came from out [sic] number fifteen[3] and [Edmunds] went up there, " they exchanged words, engaged in a "fistfight," "stopped, had more words," and "fought again." (T. 793-94, 813-14.) Petitioner "fell and more people jumped in" and "everybody started hitting [Edmunds]." (T. 795.) Petitioner "pulled a knife out and stabbed [Edmunds] . . . three times . . . in the stomach area"[4] (T. 795-96.) Edmunds fell to the ground, then "ran up the road and flagged down a car." (T. 796.) At this time, there was "[b]lood around [Edmunds'] stomach area. (T. 797.) The group who were outside of Ward's residence followed Edmunds. (T. 799.)

---

[2] Petitioner, Ward and Ward's mother and four sisters resided at 20 Saunders Avenue, Center Moriches, New York. (T. 788.)

[3] Ward is referring to a residence at 15 Saunders Avenue, Center Moriches, New York.

[4] The autopsy revealed that there were only two (2) stab wounds. (Dr. Dawson T. 1304.)

Petitioner then retrieved a metal pipe[5] from the woods and "hit [Edmunds] in the upper neck and shoulder area" with the pipe. (T. 799-800.) After Petitioner hit Edmunds with the pipe, Edmunds "was leaning against the car and [Rickey Henderson ("Henderson")] punched [Edmunds]" in his ribs. (T. 804-05.) Petitioner hit Edmunds in the head with the pipe again, Edmunds fell to the ground, and Petitioner threw the pipe at him. (T. 805-807.) "Everyone ran back down the road of Saunders," except Hill, who remained at the scene and was crying. (T. 807.) Ward testified that Hill was at the scene while Edmunds was hit with the pipe and stabbed. (T. 807-08.)

On cross-examination, Ward admitted that, on three separate occasions, he told Suffolk County police officers that he had no knowledge of the incident. (T. 818.) On redirect examination, Ward testified that he did not give Petitioner a knife and that he was "forced to say" that he "gave [Petitioner] the knife" by Detective Vincent O'Leary of the Suffolk County Police Department ("Detective O'Leary"). (T. 849-850). However, Ward reiterated that he had witnessed Petitioner stab Edmunds with a knife and hit Edmunds with a pipe. (T. 852, 854-855.)

(ii)    Tunji Massey's ("Tunji") Testimony

Tunji testified that, in the early evening hours of November 9, 1997, Edmunds and William Owens ("Owens"), Tunji's sister Ayoluwa Massey's ("Ayoluwa") boyfriend, were at Tunji's house on North Clinton Street in Center Moriches, New York. (T. 864-66.) At approximately 8:30 p.m., Edmunds walked across the street to Hill's residence. (T. 867.) Later that evening, Tunji was on the corner of North Clinton Street when he witnessed Edmunds "coming from around [the corner] on South Saunders Avenue" and "heard people yelling down

---

[5] During the trial, the weapon is referred to as either a "pipe" or a "pole."

3

on [sic] South Saunders." (T. 867-68.) Tunji started to walk toward the noise and witnessed Edmunds, with "no shirt on . . . bleeding," and a "stab wound on his stomach." (T. 871.) Tunji asked Edmunds what happened and Edmunds replied that "Corey had stabbed him." (T. 874.) Edmunds "went out to the road, flagged the car down," and, when the car stopped, Edmunds "walked around to the driver's side of the car." (T. 874-75.) Within approximately ten (10) to fifteen (15) seconds, Petitioner approached Edmunds with a "metal pipe[6] in his hand," Edmunds "put his hand up to block" himself as Petitioner swung the pipe, and the pipe "caught [Edmunds] in the arm." (T. 876-87.) Edmunds "walked around to the front of the car" and leaned over the car's hood, when Petitioner "launched" the pipe and "hit [Edmunds] over the left side of his head," causing Edmunds to fall to the ground. (T. 880.) When Petitioner hit Edmunds with the pipe, Hill, Henderson, Ralph Van Slyke ("Van Slyke"), among others, were at the scene. (T. 882-83.) Edmunds was lying on the ground "moaning" and Petitioner walked back to South Saunders, along with his brothers and friends. (T. 882-83.) As Tunji approached Edmunds, Hill was "kind of crying," and Tunji's brother, Obataiye Massey ("Obataiye"), "pulled up" in Edmunds' car so that Tunji and Owens could "take [Edmunds] to the hospital, but [they] didn't really know the way, so [they] took [Edmunds] to [a convenience store]" and asked the clerk to call an ambulance. (T. 883-85.) The ambulance arrived and attended to Edmunds. (T. 886.) Tunji told Suffolk County Police Officer Kevin Lee ("Police Officer Lee") at the convenience store, *inter alia*, that Petitioner had stabbed Edmunds and Tunji subsequently gave a statement to Detective O'Leary. (T. 887-88, 891-92.)

---

[6] Tunji described the pipe as a heavy metal pipe approximately four and one-half (4 1 /2) feet long. (Tunji T. 878.)

### (iii)    John Green's ("Green") Testimony

Green testified that, on November 9, 1997 at approximately 9:00 p.m., he was driving his car "up North Saunders onto the bypass," when he witnessed a "bunch of boys chasing one boy." (T. 927-28.) Edmunds came toward his car and Green eventually had to stop to avoid hitting Edmunds. (T. 931-33.) Edmunds pushed against Green's car door and Green noticed Edmunds had a cut in the left side of his chest area. (T. 933-34.) Green got out of his car and "someone hit [Edmunds] with a pipe." (T. 936.) Green identified Petitioner as the one who struck Edmunds with the pipe and testified that Petitioner was standing alone when he struck Edmunds, but that there were other individuals on the right-hand side of Green's car, including Henderson and Van Slyke. (T. 936-37, 939, 942, 972.) Green stated to Petitioner that it "[d]on't make no sense [sic] for a bunch of guys to jump on one guy." [T. 941-42.] Edmunds fell on the hood of Green's car, but when Edmunds stood up, a pipe came flying through the air past Green, striking Edmunds in the head, and Edmunds fell to the ground and "started shaking." (T. 943-45.) Green was facing Edmunds at the time the pipe was thrown so he did not observe who threw the pipe. (T. 944-45, 968.) Green "got in [his] car," "told [the crowd] they need to take [Edmunds] to a doctor or hospital," and left the scene. (T. 946.) Detective O'Leary subsequently interviewed and obtained a statement from Green. (T. 947-98.)

Green thereafter was visited at his residence by a young man that Green believed to be Petitioner's brother and a man whose name was "Fillipe." (T. 948.) "They told [Green] that Jin[x][7] hit [Edmunds] in the head with the pipe," but Green replied "they were too late, [Green] had already done [sic] talked to the detective." (T. 948-49.)

---

[7] Van Slyke is also known as "Jinx." (Det. O'Leary T. 1214.)

Owens testified that Edmunds arrived at his residence early in the evening of November 9, 1997, and they drove Edmunds' car to Owen's brother's house. (T. 997-98.) At approximately 8:00 p.m., Owens and Edmunds stopped at a diner so that Edmunds could telephone Hill, and then they drove to Center Moriches to go to Owen's girlfriend Ayoluwa's residence. (T. 998, 1000.) Owens further testified that Edmunds told him that he was "a little bit upset" that his girlfriend Hill was dating Petitioner. (T. 999.) At approximately 8:45 p.m., Edmunds crossed the street to go to Hill's residence, while Owens remained at his residence. (T. 1001.)

Subsequently, Obataiye drove Edmunds' car to Owens' residence and informed him that "they over there [sic] jumping [Edmunds]." (T. 1004.) Owens got into the car and they drove to where Edmunds was unconscious on the ground, with a "gash on his head" and "his tooth like [sic] partially missing." (T. 1003-06.) Ralph Velasquez, Trent, Tunji, Ayoluwa and Hill were at the scene. (T. 1005-06.) Owens and Tunji put Edmunds in the car, drove to a convenience store, and they "stopped a guy who helped [them] pull [Edmunds] out" of the car and place Edmunds "on the ground." (T. 1006-07.) The police and an ambulance subsequently arrived. (T. 1008.)

### b.    The Investigation

Police Officer Lee testified that on November 9, 1997 at approximately 9:11 p.m. he received a call from a dispatcher that a stabbing was reported at a convenience store. (P.O. Lee T. 653-54.) Police Officer Lee, as well as an ambulance, arrived at the convenience store at approximately 9:19 p.m., where Police Officer Lee witnessed Tunji and Owens "pulling" Edmunds out of a car. (P.O. Lee T. 654-55, 657, 670.) Edmunds "had an open bloody chest

wound" and "blood about his face and scalp area." (P.O. Lee T. 655.) Police Officer Lee spoke with Tunji and Owens, first together and then separately. (P.O. Lee T. 655-56.)

Police Officer Lee then instructed Suffolk County Police Officer Jeffery Linn ("Police Officer Linn") to go to 20 Saunders Avenue to "look for" Petitioner because he was a suspect in the stabbing of Edmunds. (P.O. Lee T. 659; P.O. Linn T. 691.) Police Officer Linn arrived at 20 Saunders Avenue at approximately 9:25 p.m. and several police officers subsequently arrived at the scene. (P.O. Linn T. 691-92, 736-37.) Police Officer Linn, *inter alia*, spoke with Antonia Mosely, a resident at 20 Saunders Avenue, and began "a foot search of the area," finding three red stains on the pavement that appeared to be blood, a small pile of coins, a leather belt with "a red stain on the buckle," and a gray metal pipe approximately two and one half (2 1 /2) inches in diameter and five and one half (5 1/2) feet long "with a red stain on one end." (P.O. Linn T. 692-93, 696-97, 702, 707, 717, 719-20, 727-28, 738, 742, 750-51.)

Meanwhile, Police Officer Lee remained at the convenience store, "waited for the ambulance to leave," "guarded off the area with crime scene tape," and then brought Tunji to Saunders Avenue[8] so that Tunji "could tell the detectives what he had told [Police Officer Lee] at the scene." (P.O. Lee T. 660.) At approximately 10:30 p.m., Detective O'Leary arrived on the scene with his partner, Detective James Hughes of the Suffolk County Police Department ("Detective Hughes"), and was notified that Edmunds was pronounced dead at Brookhaven Memorial Hospital at 10:25 p.m. (Det. O'Leary T. 1197-98.) The homicide squad, including Detectives O'Leary and Hughes, "took over the investigation" and started "processing the scene."

---

[8] Police Officer Lee took Tunji to the corner of Saunders Avenue and Frowein Avenue, which is the approximate location of where the incident occurred. (P.O. Lee T. 660.)

(Det. O'Leary T. 1197-99, 1202-1204.) At the scene, Detective O'Leary interviewed and took a statement from Tunji and Hill. (Tunji T. 892; Det. O'Leary T. 1198, 1236.) Hill was initially interviewed at the hospital by a homicide detective, who returned Hill to the scene. (Det. O'Leary T. 1198, 1205, 1236.) In addition, a "consent search" was conducted at 15 Saunders Avenue[9] and O'Leary interviewed several individuals at that residence, none of which could offer any information about the crime. (Det. O'Leary T. 1205-08.)

At approximately 11:20 p.m. Detectives Henry Heinssen ("Detective Heinssen") and his partner Anthony Piazza of the Identification Section of the Suffolk County Police Department arrived at the scene at Saunders Avenue. (Det. Heinssen T. 1030.) Detective Heinssen went to the convenience store to take photographs of Edmunds' car before returning to Saunders Avenue, where he conducted a video survey of the crime scene, photographed the crime scene and recovered evidence. (Det. Heinssen T. 1031-33, 1036, 1039.) Heinssen also went to the Suffolk County morgue to fingerprint Edmunds, took aerial photographs of the crime scene and processed the evidence. (Det. Heinssen T. 1059.) Heinssen was unable to find any identifiable fingerprints from the evidence collected or from Edmunds' car at the convenience store. (Det. Heinssen T. 1049, 1051, 1053-54, 1059-1060.)

Forensic Scientist Diane Alia ("Alia") of the Suffolk County Crime Laboratory, arrived at the scene at approximately 12:15 a.m. and, after comparing blood samples obtained from the crime scene with blood samples obtained from Petitioner and Edmunds, Alia testified that the

---

[9] O'Leary testified that they requested a consent search at that residence because "there was evidence on the roadway outside of that location" and a "shirt in the driveway." (Det. O'Leary T. 1205-06.) Ward testified that the incident took place at that location. (Ward. T. 813-14.)

blood obtained from various sources, including a metal pipe, the roadway, a belt buckle, a stocking cap, a pair of blue denim jeans, a jacket and a shirt, were consistent with that of Edmunds but not of Petitioner. (Alia T. 1082, 1084, 1113-1114, 1134-46.)

As the investigation continued, additional witnesses were interviewed, including Detective O'Leary interviewing Ward, Van Slyke and Green. (Det. O'Leary T. 1209-1215, 1222.) Detective O'Leary was contacted by Petitioner's attorney, who informed him that he had statements from Henderson and Green identifying someone other than Petitioner as being involved in Edmunds' murder, and Detective O'Leary advised that the attorney should "surrender [Petitioner] to [Detective O'Leary]." (Det. O'Leary T. 1220.) Around that same time, Henderson's attorney advised O'Leary that "he would surrender [Henderson] to [Detective O'Leary] at any time for an arrest, but he would not offer him to be interviewed with regard to being a possible witness in this investigation."[10] (Det. O'Leary T. 1221-22.) Detective O'Leary testified that when he interviewed Green, "it did not change [his] mind as far as [Petitioner's] involvement in the case." (Det. O'Leary T. 1224.) Detective O'Leary further testified that "[a]ll investigative information clearly identified [Petitioner] as the individual responsible for this crime." (Det. O'Leary T. 1228.)

An anonymous caller contacted the Crimestoppers Division of the Suffolk County Police Department and stated, *inter alia*, that Henderson stabbed Edmunds and Jason Fillipe ("Fillipe") punched Edmunds because Edmunds owed Fillipe "money for drugs," and identified Obataiye, Tunji and John Hobson ("Hobson") as witnesses. (Det. O'Leary T. 1231-32, 1235.) The same

---

[10] Henderson subsequently pled guilty to "an assault in the third degree for his actions in the assault that he inflicted upon [Edmunds]." (Det. O'Leary T. 1225-26.)

anonymous caller contacted the police department "two times on November 25." (Det. O'Leary T. 1232.) The information was investigated and Detective O'Leary testified, *inter alia*, that Hobson "was a complete unknown," and "the information with regard to what caused the incident to occur was totally invalid." (Det. O'Leary T. 1233-35.)

c. Physical Injuries and Cause of Death

Dr. Stuart Dawson, Suffolk County Deputy Chief Medical Examiner ("Dr. Dawson") testified that, after performing an autopsy on Edmunds, he had ruled the death a homicide and determined that the cause of death was "stab wounds and blunt force head trauma." (T. 1333.)

Dr. Dawson observed, *inter alia*, two (2) stab wounds, "involving the front of [Edmunds'] body in the region of the lower chest and upper abdomen area." (T. 1304). The "minor stab wound" was "confined to the abdominal wall." (T. 1310.) The larger stab wound was "typical of a knife wound" that "went through the upper part of the abdominal cavity[,] . . . passed through the diaphragm, . . . entered the pericardial, which is the sac that contains the heart[,]" and "the termination of the wound track entered the apex of the heart," which is the "interior or lower point of the heart." (T. 1310.) Although the "knife . . . entered into the heart muscle and . . . severed completely one of the coronary arteries . . . .", (T. 1311), "there would be nothing detrimental at all about this type of wound until such time as the blood loss associated with it became incapacitating" and Edmunds would have been able to continue running. (T. 1314.) The stab wound Edmunds received to his heart was capable of causing his death. (T. 1333).

Dr. Dawson further testified that, other than "some relatively minor scraping type injuries" he observed, that there were two (2) main areas of "more serous" injuries around

10

Edmunds' mouth and on the left side of his head, which "would be called blunt force trauma" because "[t]hese are things that will be typically associated with an object that's blunt, . . . like a baseball bat . . . as opposed to something that is sharp." (T. 1315-16.) The first blunt force injury to Edmunds' upper mouth region, nose and lower ear was "too severe to be produced by a hand," suggesting that it was caused by "something elongated and solid like a pipe." (T. 1320-21.) The second blunt force injury caused a laceration in Edmunds' scalp. (T. 1322). "Deep into this laceration . . . was a depressed fracture area . . . and . . . hemorrhaging in the soft tissues surrounding the injury," which indicated that "the degree of force required to produce these injuries, could cause death." (T. 1322-23.) Dr. Dawson further testified that these injuries were consistent with being caused by the pipe recovered at the scene, and that the "blow" to Edmunds' head would have caused him to "fall to the ground and be immediately unconscious." (T. 1329-33.) Dr. Dawson stated that it was more likely that the injury to the side of Edmunds' head was caused by someone holding the pipe as opposed to someone throwing the pipe. (T. 1344-45, 1357.) The blunt force trauma and skull fracture on the left side of Edmunds' head were capable of causing his death. (T. 1333)

2.    The Defense

a.    Hills' Testimony

Hill testified that "[Hill and Edmunds] broke up" in or about August or September 1997. (T. 1386.) On November 9, 1997, Edmunds telephoned Hill at approximately 8:00 p.m., asking *inter alia*, who Petitioner was and whether Hill was "seeing" Petitioner. (T. 1391-92.) When Hill told Edmunds that she "hung out with [Petitioner], that was it," Edmunds accused Hill of

11

"lying" and stated that he was "coming to talk to [Hill] right now."[11] (T. 1392-93.) At approximately 8:30 p.m., Edmunds arrived at Hill's residence and "[Edmunds] came storming in the house and he started yelling." (T. 1394.) Hills' grandmother told them "to go outside." (T. 1394.)

At approximately 8:35 p.m., Hill and Edmunds got into Edmunds car and drove to Saunders Avenue to locate Petitioner. (T. 1394-96.) Hill warned Edmunds that this "was not a good idea" because there are "a lot of people . . . there." (T. 1399.) When they arrived, Edmunds exited the car and approached a group of people, including Van Slyke, Terrence Trent ("Trent"), Henderson, Obataiye, Corey Winston ("Winston") and Lamarc Franklin ("Lamarc"), asking Petitioner to identify himself. (T. 1401, 1403-1404.) Petitioner "stepped" forward, Edmunds and Petitioner "had a couple of words with each other," it "was over and [Edmunds] got back in the car." (T. 1401-04.)

Hill was trying to get back in the car but Van Slyke prevented Hill from doing so causing Edmunds to exit the car again. (T. 1403.) Van Slyke and Edmunds "had a few words" and were "tugging on [Hill]." (T. 1407.) "[T]he group of people outside started calling [Edmunds] names," such as "punk," and Edmunds and Petitioner "got back into each other's face again." (T. 1407.) Edmunds "swung" at Petitioner, who "fell to the ground," then "jumped on top of [Petitioner]" and "started punching [Petitioner] in the face."[12] (T. 1407-09.) Approximately ten (10) to twenty (20) people jumped on Edmunds, and Hill subsequently "jumped on top of the

---

[11] During their conversation, the telephone call was disconnected and Edmunds called Hill back. (T. 1391, 1393.)

[12] Hill conceded on cross-examination that she had testified to the Grand Jury that Petitioner "was punching [Edmunds] as well." (T. 1465-66.)

group . . . trying to pull people off" Edmunds. (T. 1410.) Edmunds "jumped up" and ran from the group toward the end of the street. (T. 1411.) Hill testified that she did not see a knife in Petitioner's hand and that Edmunds was not bleeding or injured at this time.[13] (T. 1410-12).

Hill searched for Edmunds' car keys and yelled to Edmunds to "go to [her] house" and she'll "get his car." (T. 1412.) As she was searching, Petitioner was standing near the area where the altercation had occurred, and told Hill that he wanted to talk to her. (T. 1412-16.) Hill replied that she "didn't have time to talk" because she had to "get [Edmunds'] car out of here and go see if he's okay." (T. 1416-17.) Hill noticed a group of people running towards the end of the street. (T. 1418.) Hill told Obataiye to "take the car . . . and pick up [Edmunds] from [her] street," and ran toward the end of the street, where she saw a group of people surrounding Edmunds. (T. 1418-19.) Although Hill testified that she witnessed "a long object go and swing out in the air, and it hit [Edmunds] on the side of the face" she stated that she was unable to see who swung the object or identify anyone in the group, (T. 1419-21), she also testified that she did not witness Petitioner or Tunji at the scene when Edmunds was struck with the pipe. (T. 1423-24.)

After Edmunds "got hit with the pipe everybody . . . scattered." (T. 1424.) Edmunds was "saturated with blood" and bleeding from his head. (T. 1424, 1491.) Hill tried to talk to Edmunds but "[e]very time he tried to talk . . . he would just cough of blood." (T. 1425.) Hill told Edmunds that, if he could hear her, then he should squeeze her hand, and "[Edmunds] squeezed her hand at one point." (T. 1425.) Henderson approached Edmunds, kicked Edmunds

---

[13] Hill testified before the Grand Jury that, when Edmunds ran from the group, she "thought [Edmunds] might have got [sic] stabbed." (T. 1485-87.)

in the head, pulled on Hill's shirt and told Hill to "[g]et up . . . [y]ou don't need him." (T. 1425.) "[Owens] and [Ayoluwa] pulled up in a car," Obataiye "pulled up in [Edmunds'] car," and "it looked like [Tunji] came from the back of [Ayoluwa's] car." (T. 1425-26.) Van Slyke told Owens and Ayoluwa to "get [Edmunds] in the car" and Hill ran home to call a friend at Brookhaven Hospital, where Owens was taking Edmunds. (T. 1426-28.) Hill went to the hospital, where she spoke with detectives before returning home. (T. 1429-30.) Upon her return home, Hill also spoke with detectives and "walked the scene." (T. 1430-31.)

        b.      Trent's Testimony

Trent testified that, on November 9, 1997, he witnessed Edmunds exit his car and ask "Who is Corey Franklin?" (T. 1521.) Petitioner identified himself and walked toward Edmunds. (T. 1522.) Edmunds asked if he had been "messing around" with Hill and Petitioner responded "[n]o." (1522-23.) Petitioner started "walking away" and Edmunds "punched [Petitioner] twice," causing Petitioner to fall to the ground. (T. 1523-24.) "Van Slyke ran towards [Edmunds] and just started jumping on him," as well as a "few other people which [Trent] couldn't identify." (T. 1524-25.) Edmunds "ran up the driveway as to try to get away" and Van Slyke followed Edmunds. (T. 1526-27.) Trent further testified that he could not see what occurred in the driveway because his view was obstructed by "bushes." (T. 1527.)

Edmunds came "running out [sic] the driveway" and Edmunds and Henderson "fell into each other." (Id.) Edmunds "got right up after the fall" and "started running up Saunders." (Id.) Trent did not witness anyone with a weapon but he testified that, as Edmunds was "running up Saunders," he noticed blood coming from the "left side" of Edmunds' "stomach area." (T. 1527-28.) Petitioner was standing "right next to [Trent]" during this time and, after a few minutes,

14

Trent walked up the street and witnessed Edmunds "laying on the ground," bleeding from his mouth, and Trent "yell[ed]" to Hill "to take [Edmunds] to the hospital." (T. 1528, 1562.)

c.    <u>Denise Bullard's Testimony</u>

Denise Bullard ("Bullard"), Tunji's first cousin, testified that, in mid-November 1997, Tunji told Bullard that he witnessed "[Petitioner] or somebody who looked like [Petitioner] hit [Edmunds] with a pipe," and that he just assumed it was Petitioner. (T. 1569-71.) Later that month, Tunji told Bullard that "he seen the pipe being swung [sic] but he couldn't tell who did it because there was a car between them."[14] (T. 1571-72.) Bullard also testified that "when [Tunji] was in the car on the way to the hospital, . . . [Edmunds] told him that some kid named Corey did this to him but he didn't state exactly what was done." (T. 1571-72.)

3.    <u>Verdict and Sentence</u>

Following a jury trial, Petitioner was found guilty of murder in the second degree, N.Y. Penal Law § 125.25(1), and was sentenced to a term of imprisonment of twenty-five (25) years to life.

B.    Procedural History

Petitioner appealed the judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department on the grounds that: (1) "the trial court erred when it denied [Petitioner's] challenges for cause for three separate prospective jurors;" (2)

---

[14] During cross-examination, Tunji testified that he did not make these statements to Bullard. (Tunji T. 913-14.)

"the trial court denied [Petitioner] a fair trial when it failed to conduct an inquiry on the issue of whether the jury's impartiality was compromised after an unsubstantiated allegation that jurors had been intimidated;" (3) "the trial court erred when it denied [Petitioner's] request to charge lesser included offenses;" (4) "the prosecutor denied [Petitioner] a fair trial during her questioning of various witnesses;" (5) "the prosecutor through various comments made on summation deprived [Petitioner] of a fair trial;" (6) "the trial court improperly allowed the prosecutor to impeach her own witness;" (7) "the trial court erred by failing to charge causation;" (8) "the People failed to prove [Petitioner's] guilt beyond a reasonable doubt;" and (9) "the sentence imposed was harsh and excessive." (Return, filed Apr. 19, 2006 ("Return"), ¶ 6; see also Decl. of Pet., filed Feb. 9, 2006 (Pet.'s Decl."), ¶ 9.)

By Order dated May 10, 2004 ("May 2004 Order"), the Appellate Division, Second Department, affirmed the judgment of conviction, finding, *inter alia*, that (1) Petitioner's "challenge to the legal sufficiency of the evidence was unpreserved for appellate review;" (2) the evidence "was legally sufficient to establish [Petitioner's] guilt beyond a reasonable doubt;" (3) "the verdict of guilt was not against the weight of the evidence;" (4) "the County Court providently exercised its discretion in rejecting [Petitioner's] challenge for cause to prospective juror number one;" (4) "the County Court properly refused" to charge "criminally negligent homicide, manslaughter in the second degree, and assault in the first degree as lesser-included offenses" and explained that "where [Petitioner] repeatedly stabbed the victim and struck him over the head with a metal pipe, there was no reasonable view of the evidence which would support a finding that [Petitioner's] conduct was motivated by anything other than an intent to cause the death of the victim;" (5) "[t]he sentence imposed was not excessive;" and (6)

16

Petitioner's "remaining contentions" are either "unpreserved for appellate review or without merit." People v. Franklin, 7 A.D.3d 966, 968, 776 N.Y.S.2d 596, 596-98 (App. Div. 2d Dep't. 2004) (citations omitted).

On October 13, 2004 the Appellate Division, Second Department, denied Petitioner's motion to reargue the May 2004 Order. The New York Court of Appeals denied leave to appeal the May 2004 Order on November 11, 2004. See People v. Franklin, 3 N.Y.3d 756, 788 N.Y.S.2d 673 (2004).

On or about February 9, 2006, Petitioner filed the instant Petition alleging that: (1) "the evidence adduced at trial was legally insufficient to establish [Petitioner's] guilt of intentional murder beyond a reasonable doubt, as there was no reasonable view of the evidence that [Petitioner] had a conscious objective to kill;" (2) "the trial court failed to charge causation, thus, constructively amending [Petitioner's] indictment as the People's case has failed to establish [Petitioner] caused [Edmunds'] death by both stabbing him and then later [sic] hitting him in the head with a blunt force object;" and (3) "the trial court failed to submit to [Petitioner's] jury the lesser included offenses of assault, manslaughter and criminal negligent homicide, even though a reasonable view of the evidence supported such down [sic] charges." (Pet.'s Decl. ¶ 16.) Respondent filed the return on April 19, 2006.

II.     Discussion

A.     Pro Se Status

A *pro se* petitioner's submissions are held "to less stringent standards than formal

pleadings drafted by lawyers . . . . " <u>Hughes v. Rowe</u>, 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (quoting <u>Haines v. Kerner</u>, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). Thus, a court must "read the pleadings of a *pro se* plaintiff liberally and interpret them to raise the strongest arguments that they suggest." <u>McPherson v. Coombe</u>, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotations and citations omitted). Nonetheless, a *pro se* petitioner is not exempt from compliance with relevant rules of procedural and substantive law. <u>See</u> <u>Traguth v. Zuck</u>, 710 F.2d 90, 95 (2d Cir. 1983).


B.    Exhaustion

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), requires that prior to bringing a petition for habeas corpus relief in federal court, a petitioner must "exhaust the remedies available in state court or demonstrate that 'there is an absence of available State corrective process [or that] circumstances exist that render such process ineffective to protect the rights of the [petitioner].'" <u>Fama v. Comm'r of Corr. Servs.</u>, 235 F.3d 804, 808 (2d Cir. 2000) (citing <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). To meet the exhaustion requirement, a petitioner must have presented to the state courts "both the factual and the legal premises of the claim he asserts in federal court." <u>Blazic v. Henderson</u>, 900 F.2d 534, 537 (2d Cir. 1990) (citations and quotation narks omitted).

Contrary to Respondent's contention that Petitioner failed to exhaust his claim of legal insufficiency, Petitioner fairly presented this claim to the state court.[15] The Appellate Division, Second Department, reviewed and denied Petitioner's claim of legal insufficiency based upon

---

[15] There is no dispute that the other claims asserted by Petitioner are exhausted.

procedural grounds as well as on the merits. See Franklin, 7 A.D.3d at 966.

C.    Claim of Legal Insufficiency

A federal court may not review a state prisoner's federal claims if the claims were denied in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 749-750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). To establish procedural default, the state court's reliance on state law must be "clear from the face of the opinion." Fama, 235 F.3d at 809 (2d Cir. 2000) (citations and internal quotation marks omitted). If a state court holding contains a plain statement of procedural default then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (stating that "a state court need not fear reaching the merits of a federal claim in an alternative holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision). When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is procedurally defaulted. See Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005).

The Appellate Division, Second Department, rejected petitioner's legal insufficiency claim on appeal as "unpreserved for appellate review," then ruled that, in any event, the claim was without merit since the evidence, viewed in the light most favorable to the prosecution, "was legally sufficient to establish [Petitioner's] guilt beyond a reasonable doubt" and "that the verdict

19

of guilt was not against the weight of the evidence." Franklin, 7 A.D.3d at 966, 776 N.Y.S.2d at 597 (citations omitted). Since the Appellate Division, Second Department, clearly invoked a state procedural rule as a basis for its rejection of Petitioner's legal insufficiency claim, and Petitioner has not demonstrated cause for default, actual prejudice, or that it would be a fundamental miscarriage of justice if that claim were not reviewed, that claim is barred from federal habeas review.

In any event, Petitioner's legal insufficiency claim is without merit. When considering the legal sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." Policano v. Herbert, 430 F.3d 82, 87 (2d Cir. 2005) (citing Fama, 235 F.3d at 811). Under New York law, "[a] person is guilty of murder in the second degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person . . . ." N.Y. Penal Law § 125.25(1).

An applicant for federal habeas review must rebut the legal sufficiency of a conviction by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1). Petitioner must show that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The court must draw all inferences from the evidence in favor of the prosecution and resolve all issues of credibility in favor of the fact finder's verdict. See United States v. Jackson, 345 F.3d 59, 65 (2d Cir. 2003) (citations omitted).

Although Petitioner alleges, *inter alia*, that: (1) the evidence is insufficient to establish "beyond a reasonable doubt that [Petitioner] intentionally caused [Edmunds'] death by stabbing him and hitting him in the head with . . . the metal pipe;" and (2) Dr. Dawson's testimony

"signifies that there was no accurate assessment of the cause of death," (Pet.'s Mem. of Law, filed Feb. 9, 2006 (Pet.'s Mem."), p. 22), Petitioner fails to meet his burden of producing clear and convincing evidence to rebut the jury's verdict, based upon, *inter alia*, that: (1) the prosecution presented evidence, including, eyewitness testimony, to establish that Petitioner stabbed Edmunds in the chest and struck Edmunds in the head with a metal pipe; and (2) Dr. Dawson testified that "the cause of death was stab wounds and blunt force head trauma," (Dr. Dawson T. 1332-33), and that the injuries to Edmunds' head were consistent with the metal pipe recovered at the scene, (Dr. Dawson T. 1321-29), which was described by witnesses as the weapon that Petitioner used to strike Edmunds. Since there is sufficient evidence from which the jury could find that Petitioner caused the death of Edmunds with the intent to cause his death, Petitioner's legal insufficiency claim is without merit.

Petitioner's claims that challenge the witnesses' credibility or the weight of their testimony, cannot provide a basis for habeas relief. See Huber v. Schriver, 140 F. Supp. 2d 265, 277 (E.D.N.Y. 2001) (stating that "[f]ederal habeas courts are not free to reassess the [fact-specific] credibility judgments by juries or to weigh conflicting testimony;" and, "[a federal habeas court] must presume that the jury resolved any questions of credibility in favor of the prosecution") (citations and quotation marks omitted); see also Fagon v. Bara, 717 F. Supp. 976 (E.D.N.Y. 1989).

Accordingly, the Petition is denied as to this claim.


D.    Standard of Review under the AEDPA

The AEDPA governs applications of incarcerated state court defendants seeking federal

habeas corpus relief. <u>See</u> 28 U.S. C. § 2254. Pursuant to § 2254(d), an application for a writ of habeas corpus that has met the procedural prerequisites

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" <u>Bell v. Miller</u>, 500 F.3d 149, 155 (2d Cir. 2007) (quoting <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 312 (2d Cir. 2001)); <u>see also</u> <u>Spears v. Greiner</u>, 459 F.3d 200, 203 (2d Cir. 2006), <u>cert.</u> <u>denied</u> <u>sub</u> <u>nom</u> <u>Spears v. Spitzer</u>, 549 U.S. 1124, 127 S.Ct. 951, 166 L.Ed.2d 725 (2007) (accord).

Once claims have been adjudicated on the merits, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); <u>see also</u> 28 U.S.C. 2254(d) (1). Alternatively, a federal habeas court may "'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." <u>Wiggins v. Smith</u>, 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing <u>Williams</u>, 529 U.S. at 413, 120 S.Ct. 1495, 146 L.Ed.2d 389). Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal

law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411, 120 S.Ct. 1495, 146 L.Ed.2d 389; see also Wiggins, 539 U.S. at 520-21, 123 S.Ct. 2527, 156 L.Ed.2d 471 (holding that the state court's decision must have been more than incorrect or erroneous; its application must have been "objectively unreasonable"). Under the AEDPA, determination of the factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### 1.     Failure to Instruct the Jury with Causation

Before a federal court may grant a writ of habeas corpus on the basis of an erroneous jury instruction, the petitioner must establish "not merely that the instruction is undesirable, erroneous, or even 'universally condemned' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); see Blazic, 900 F.2d at 540. A petitioner is not deprived of due process by a mere error of state law. See id. at 541.

Moreover, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Id. at 146-147. "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736-37, 52 L.Ed.2d 203 (1977). The question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Cupp, 414 U.S. at

147, 94 S.Ct. at 400; see Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson, 431 U.S. at 155, 97 S.Ct. at 1737.

Contrary to Petitioner's claim, the failure to instruct the jury on the issue of causation did not "constructively amend [] the indictment." (Pet.'s Mem. at 30; Pet's Decl. ¶ 16.) Specifically, Petitioner alleges that it was "incumbent on the trial court to specify" that the prosecutor must "prove [Petitioner] caused [Edmunds'] death by stabbing him and striking him with a blunt force object." (Pet.'s Mem. at 29-30.)

The indictment, which was read to the jury, charged Petitioner with two counts of murder in the second degree, stating *inter alia*, that: (1) as to Count One: Petitioner, on or about November 9, 1997, " . . . with intent to cause death, caused the death of [Edmunds] by stabbing him and by striking him in the head with a pipe;" and; (2) as to Count two: Petitioner, on or about November 9, 1997, " . . . under circumstances evincing a depraved indifference to human life, recklessly engaged in conduct which created a grave risk of death to [Edmunds] by stabbing him and by striking him in the head with a pipe, thereby inflicting injuries to [Edmunds] which caused his death." (T. 640-41.)

The jury was instructed, *inter alia*, that: (1) as to Count One: (a) "a person is guilty of murder in the second degree when, with intent to cause the death of another person, he or she causes the death of such person;" and (b) "in order for you to find [Petitioner] guilty of this crime of intentional murder, the People are required to prove, from all the evidence in the case, beyond a reasonable doubt, both of the two following elements: that . . . [Petitioner] caused the death of [Edmunds]" and "[Petitioner] did so with intent to cause the death of [Edmunds];" and (2) as to

24

Count Two: (a) "a person is guilty of murder in the second degree when, under circumstances evincing a depraved indifference to human life, he or she recklessly engages in conduct which creates a grave risk of death to another person and thereby causes the death of that person; and (b) "in order for you to find [Petitioner] guilty . . . of this crime, the People are required to prove from all of the evidence, beyond a reasonable doubt, three elements: . . . [Petitioner] caused the death" of Edmunds, "[Petitioner] did so by recklessly engaging in conduct which created a grave risk of death to [Edmunds]," and "[Petitioner] engaged in such conduct under circumstances evincing a depraved indifference to life." (T. 1708-11.)

Even if the omission was an error of state law, it did not "so infect[] the entire trial that the resulting conviction violates due process," Cupp, 414 U.S. at 147, 94 S.Ct. 396, and did not result in a decision that was either "contrary to, or involved an unreasonable application of, clearly established Federal law;" or "based on an unreasonable determination of the facts in light of the evidence presented . . . ." 28 U.S.C. § 2254(d). The jury was instructed that, in order to find Petitioner guilty of murder in the second degree, that Petitioner must have "caused" the death of Edmunds and that all the elements of the crime must be proved beyond a reasonable doubt. The evidence presented, including the testimony of Dr. Dawson, established that the cause of death was "stab wounds and blunt force head trauma." (Dr. Dawson. T. 1333.) The prosecutor did not assert nor present any evidence to contradict their theory that Edmunds' death was caused by both stab wounds and blunt force trauma. As noted above, there is sufficient evidence on the record for the jury to find that Petitioner caused the death of Edmunds by stabbing him in the chest and striking him in the head with a metal pipe. Even if the jury were given a separate instruction on causation, the evidence overwhelmingly demonstrates that the

jury would have reached the same conclusion beyond a reasonable doubt. Accordingly, the Petition is denied as to this claim.

2.  Failure to Charge Lesser Included Offenses

"[I]n this circuit, habeas review of a state trial court's failure to instruct on lesser included offenses in noncapital cases is precluded." Bien v. Smith, 546 F. Supp. 2d 26, 43 (E.D.N.Y. 2008) (citing Maldonado v. West, No. 05 Civ. 3132, 2007 WL 188684, at *6 (E.D.N.Y. Jan. 22, 2007); Caimite v. Fischer, No. 05 Civ. 3324, 2009 WL 236917, at * 9 (E.D.N.Y. Feb. 2, 2009); see also Jones v. Hoffman, 86 F.3d 46, 48 (2d Cir. 1996) (stating that, "[s]ince a decision interpreting the Constitution to require the submission of instructions on lesser-included offenses in non-capital cases would involve the announcement of a new rule," courts are precluded from considering this issue on a habeas petition) (citation omitted); Knapp v. Leonardo, 46 F.3d 170, 179 (2d Cir. 1995) (stating that "[n]either the Supreme Court nor this circuit has decided whether the failure to instruct a jury on lesser included offenses in noncapital cases is a constitutional issue that may be considered on a habeas petition."), cert. denied, 515 U.S. 1136, 115 S. Ct. 2566, 132 L.Ed.2d 818 (1995).

Even assuming, *arguendo*, that this was a proper subject for review under the AEDPA, the trial court's refusal to include the lesser included offenses did not result in a decision that was either "contrary to, or involved an unreasonable application of, clearly established Federal law," or "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). "A trial judge must charge the jury on lesser included offenses when (1) it is theoretically impossible to commit the greater crime without committing the lesser and (2) a

reasonable view of the evidence would permit the jury to find that the defendant had committed the lesser, but not the greater, offense." Rice v. Hoke, 846 F.2d 160, 165 (2d Cir. 1988) (citations omitted); see also N.Y. Crim. Proc. L. § 300.50(1). No reasonable view of the evidence would permit the jury to find that Petitioner acted negligent, reckless or with the intent only to cause serious physical injury based upon the facts in this case, *inter alia*, that Petitioner stabbed Edmunds multiple times and struck him in the head with a metal pipe. Accordingly, the Petition is denied as to this claim.

III.    Conclusion

The Petition for writ of habeas corpus is DENIED in its entirety and the proceeding is dismissed. Since petitioner has failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253; see also Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); Luciadore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000); Kellogg v. Strack, 269 F.3d 100, 102 (2d Cir. 2001). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253. Based upon dismissal of the Petition, Petitioner's remaining applications are denied as moot. The Clerk of the Court is directed to close.

**SO ORDERED.**

_____
Sandra J. Feuerstein
United States District Judge

Dated: March 19, 2009
Central Islip, New York

Copies to:

Corey Franklin
99A2272
Eastern NY Correctional Facility
Box 338
Napanoch, NY 12458-0338